# In the
# United States Court of Appeals
## For the Seventh Circuit
————————

No. 07-2689

LISA GRIFFIN and MICHAEL W. GRIFFIN,

*Plaintiffs-Appellants,*

*v.*

ROBERT K. FOLEY, M.D.,

*Defendant-Appellee.*

————————

Appeal from the United States District Court
for the Southern District of Indiana, Evansville Division.
No. 05 C 15—**Richard L. Young**, *Judge.*

————————

ARGUED FEBRUARY 28, 2008—DECIDED SEPTEMBER 4, 2008

————————

Before FLAUM, MANION, and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* As a result of a car accident, Lisa Griffin had to undergo back surgery, which Dr. Robert Foley performed. After complications arose from the surgery, Lisa and her husband Michael filed this diversity suit against Foley in the district court alleging medical malpractice. The case went to trial, and a jury returned a verdict in favor of Foley. The Griffins appeal, raising

several challenges to the trial court's procedural handling of their case. We affirm.

## I.

On June 11, 1994, while traveling through Georgia, the Griffins' minivan was struck in the rear by a pickup truck. As a result of the collision, Lisa Griffin ("Lisa") sustained severe injuries, including a burst fracture[1] at the L1 vertebra. Lisa was flown to Evansville, Indiana, where, on June 14, 1994, orthopedic surgeon Dr. Robert Foley performed both a laminectomy[2] and a spinal fusion on her back. During the operation, Foley used an internal fixation device consisting of rods and hooks to keep Lisa's back in place. He then combined the bone he took from Lisa's lamina with coralline hydroxyapatite, a bone graft substitute made of coral reef that goes by the trade name Pro Osteon. Although the Food and Drug Administration had approved Pro Osteon as a bone graft substitute to fill holes in bone, the FDA had not specifically

---

[1] A burst fracture, or axial compression, is a "fracture of a vertebra by excessive vertical force, so that pieces of it move out in horizontal directions, often injuring the spinal cord." Dorland's Illustrated Med. Dictionary 708 (29th ed. 2000).

[2] A laminectomy is the surgical removal of one or more pieces of bone from the lamina, a part of the posterior structure of a vertebra, in order to relieve the pain caused by pressure on a nerve being compressed by bones in the spine. Am. Med. Ass'n, Complete Med. Encyclopedia 768 (2003) (hereinafter "Encyclopedia").

approved it for use as a bone graft extender in spinal fusions. Foley placed the mixture at the fracture site as a bone graft and completed the surgery.

Foley continued to see Lisa in follow-up visits after the surgery. While at trial the parties disputed the relative success of the surgery, it was undisputed that, in October 1994, x-rays of Lisa's back showed increased kyphosis[3] in her spine, a recognized complication of spinal fusion surgery. The kyphosis made the rods and hooks from the fixation device conspicuous underneath her skin, so on May 16, 1995, Foley performed a second surgery on Lisa to remove the internal fixation device. However, a later x-ray taken in March 1996 showed further kyphosis in Lisa's spine. At this point, Foley recommended additional surgery—the parties disputed the nature of the surgery recommended—which Lisa declined. Later on, the failure of the back fusion to achieve a union (another recognized complication of fusion surgery) became evident. When Foley ought to have been aware of that fact and how he should have reacted were vigorously contested at trial. As a result of her back, Lisa is now permanently disabled and unable to work.

The Griffins initiated this medical malpractice suit against Foley on June 11, 1998. Pursuant to Indiana law,[4] they first filed a proposed complaint with the Indiana Department of Insurance alleging that Foley was

---

[3] Kyphosis is an "abnormal and excessive outward curvature of the vertebrae in the upper spine." Encyclopedia 764.

[4] *See* Ind. Code § 34-18-8-4.

negligent because, among other things, he used Pro Osteon as a bone graft substitute in Lisa's spine surgery when it was not FDA-approved for that use and had no therapeutic benefit as a bone graft substitute in spinal fusion surgery. The Department of Insurance assembled a medical review panel to review the case.[5] After the case languished before the panel for over six years, the panel issued a one-sentence opinion: "The evidence does not support the conclusion that the defendant failed to meet the applicable standard of care as charged in the complaint."[6]

The Griffins then took their case to federal court in January 2005. Trial was scheduled for October 10, 2006, and the case management plan approved by both parties and the district court gave the Griffins until April 18, 2006, and Foley 60 days thereafter, to submit the expert witness reports required by Federal Rule of Civil Procedure 26.[7] On April 18, 2006, the Griffins filed Rule 26

---

[5] *See* Ind. Code § 34-18-10-1 et seq.

[6] Under Indiana law, an opinion by a medical review panelist is not conclusive of the issue of liability. Ind. Code § 34-18-10-23. However, that statute also provides that "either party, at the party's cost, has the right to call any member of the medical review panel as a witness. If called, a witness shall appear and testify." *Id*.

[7] Federal Rule of Civil Procedure 26(a)(2)(A) requires a party to "disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of
(continued...)

reports for their experts: Dr. Lawrence Weis, Dr. Robert Lieberson, Dr. Timothy Lalk, and Professor John Navin. After the Griffins filed their expert witness reports, Foley noticed Navin's deposition for April 28, 2006. Three days prior to the deposition, the Griffins' counsel served notice that he would be videotaping Navin's deposition for purposes of trial.[8] In response, Foley filed a motion for a protective order seeking to preserve the opportunity to cross-examine Navin for purposes of trial at a later date. In that motion, Foley asserted that the Griffins' counsel had refused to produce Navin at a later date to allow the defense to cross-examine him for purposes of trial. The magistrate judge assigned to the case granted Foley's motion, stating in its order that Navin must appear for his previously noticed discovery deposition

---

[7] (...continued)

Evidence 702, 703, or 705." Along with the disclosure of the identity of its experts, a party must also submit a written report, "prepared and signed" by the expert, which contains (among other things) "a complete statement of all opinions the [expert] will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B). "Absent a stipulation or a court order," these expert disclosures must be made either 90 days before trial or, "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B)," 30 days after the other party's disclosure. *Id*. 26(a)(2)(C).

[8] Federal Rule of Civil Procedure 30(b)(3)(A) allows for audio-visual recording of a deposition. In addition, Rule 32(a)(4) allows a party to use the deposition of a witness for any purpose at trial if the court finds that the witness is "unavailable."

and that, thereafter, the parties were free to examine or cross-examine Navin at a later date for purposes of eliciting trial testimony. The order also stated that Foley was entitled to cross-examine the Griffins' other experts prior to trial after taking their discovery depositions. In a later order expounding on its reasons for granting the motion, the magistrate judge stated that it was "reasonable to allow some period of time between discovery of all the information used by an expert and the preparation of cross-examination for trial."[9]

Foley then proceeded to take depositions of the Griffins' retained experts for discovery purposes. The Griffins' counsel provided notice that the evidentiary depositions of Navin, Weis, and Lalk would immediately follow their discovery depositions. When Foley's counsel was finished questioning in each of those three depositions, the Griffins' counsel conducted a direct examination of the expert for use at trial. At a later date, Foley conducted a follow-up deposition with each of those three experts for purposes of evidentiary cross-examination before trial. At the beginning of Weis's follow-up deposition for cross-examination, the Griffins' counsel asked additional questions of Weis intended to supplement his direct examination, to which Foley's counsel objected because the Griffins had already passed the witness.

---

[9] The magistrate judge also noted that there was a dispute as to whether the Griffins had sufficiently complied with all of Foley's discovery requests with respect to the Griffins' expert witnesses, a dispute that the magistrate judge was unable to resolve.

On June 19, 2006, the defense submitted its Rule 26 expert disclosures, but did not include any Rule 26 reports from the members of the medical review panel. The Griffins then filed a motion for sanctions under Fed. R. Civ. P. 37 based, in part, on the absence of those Rule 26 reports. The magistrate judge concluded in an August 16, 2006, telephone conference that no sanctions were warranted and that there was good cause to extend the deadline for expert disclosures, though Foley would have to file Rule 26 reports from the members of the medical review panel he wished to call at trial. The magistrate judge stated that it did not expect those reports to be completed until "about September 15 or so." Aware that allowing the disclosures so close to the October 10 trial date had the potential to prejudice the Griffins, the magistrate judge was quick to remind counsel for the Griffins that the trial date could be continued if necessary. In a subsequent written order, the magistrate judge ordered the defendant to produce disclosures for the medical review panel "forthwith" while, at the same time, allowing for the possibility that the trial date would have to be moved "a short time" should the disclosures not be immediately forthcoming.

While the motion for sanctions was pending, the Griffins filed a motion on August 9 to bar testimony by any defense expert that the use of coral reef as a bone substitute met the standard of care. On August 25, the same day the magistrate judge entered his written order on the Griffins' motion for sanctions, Foley requested an extension of time to respond to the Griffins' August 9 motion to bar expert testimony. Foley stated in that request

that he could not respond to that motion without first submitting the Rule 26 expert reports for the medical review panelists. While Foley admitted that he could respond to the motion as it related to Dr. Rick Sasso, his retained expert, he argued that to do so before the completion of the medical review panelists' expert reports would lead to duplicative briefing. The court granted Foley an extension "up to and including the date the Court mandates Rule 26 reports be submitted for the medical review panel members" to respond to the Griffins' August 9 motion. Foley filed his response on September 27, but the response did not encompass the members of the medical review panel. Foley chose not to file Rule 26 reports from members of the medical review panel and did not call them at trial.

On the same day Foley responded to the August 9 motion, he also filed several motions in limine, including motions that sought to limit the expert testimony of the Griffins' retained experts. The Griffins moved to strike Foley's motions to limit expert testimony, but on October 4, 2006, the district court denied that motion and proceeded to decide all the pending motions in limine, granting some and denying others. The next day, the Griffins filed a motion to continue the trial, which the district court granted. The trial did not begin until April 6, 2007.

Prior to trial, the Griffins' counsel provided notice of their intent to utilize the "discovery" portions, that is, the portions where Foley's attorney had questioned the Griffins' experts, of the first depositions of Navin, Lalk, and Weis at trial. Foley objected to the Griffins' using that

testimony at trial, and the court ruled that those "discovery" portions of the first depositions were not admissible at trial. The court limited the Griffins to the "evidentiary" portions of the first depositions, that is, to the latter portion of those depositions where their attorney had questioned their experts. The district court also ruled that the questions the Griffins' counsel asked Weis at the beginning of the follow-up deposition were not admissible. At trial, the "evidentiary" portions of those three witnesses' first depositions were played to the jury, followed by the second follow-up depositions for cross-examination. Other than Lieberson, the plaintiffs' experts did not otherwise testify at trial.

At the close of the evidence, the district court held an informal instructions conference. Both parties tendered proposed instructions. When trial resumed the next day, the district court stated on the record that the parties had agreed on a packet of final instructions. The district court then provided the parties an opportunity to make a record with respect to those instructions. The Griffins' counsel objected to an instruction on the statute of limitations. The district court denied that objection and asked the Griffins' counsel if any further record needed to be made on the instructions or verdict form. The Griffins' counsel replied, "Nothing on that, Your Honor."

Prior to closing argument, the court read to the jury—without objection—the jury instructions that had been agreed upon by the parties. Instructions 20, 21, and 22 of the agreed instructions were very similar to the respec-

tive Indiana Pattern Jury Instructions,[10] except that they used the phrase "orthopaedic surgeon" where the pattern instructions used "health care provider." During closing argument, Foley's attorney repeated Instruction 22, which reads: "In deciding whether an orthopaedic surgeon exercised reasonable care and skill in the treatment of a patient, you must consider only the expert testimony of

---

[10] Instruction 20 stated:

> An orthopaedic surgeon commits an act of malpractice when the orthopaedic surgeon fails to exercise the degree of reasonable care and skill in providing health care to a patient as would a reasonably careful, skillful and prudent orthopaedic surgeon acting under the same or similar circumstances, or the failure to do something that the orthopaedic surgeon should have done under the circumstances.

Instruction 21 stated:

> Orthopaedic surgeons are allowed wide range in exercising their judgment and discretion. They are not limited to the most generally used methods of treatment.
>
> When other approved methods of treatment are available, the orthopaedic surgeon must exercise sound judgment in choosing the treatment. If an orthopaedic surgeon exercises sound judgment in selecting from a variety of approved treatments and uses ordinary care and skill in treating a patient, then the orthopaedic surgeon is not responsible for the treatment's lack of success.
>
> The fact that other methods existed or that another orthopaedic surgeon would have used a different treatment does not establish malpractice.

qualified orthopaedic surgeons who are members of the orthopaedic surgeon's profession." He then stated: "Dr. Lieberson is not an orthopedic surgeon[ ], ladies and gentlemen." Counsel for the Griffins immediately objected and a bench conference ensued. At the conference, the district court denied the objection, but allowed the Griffins' attorney to argue during rebuttal that the court recognized Lieberson (who was a neurosurgeon) as an expert. After the bench conference concluded and upon resuming his closing argument, Foley's counsel stated that Lieberson's "testimony cannot be considered when you're analyzing whether Dr. Foley met the standard of care. That is your instruction." During his rebuttal, the Griffins' attorney told the jury the following:

> Now, [Foley's attorney] spent a big time telling you about Dr. Lieberson, his not being qualified to render an opinion because of the jury instruction, and you saw me run up to the bench. That's a mistake in the jury instructions. Dr. Lieberson was recognized as an expert by His Honor. His Honor said he's qualified to render opinions in this case. We asked both Dr. Weis and Dr. Lieberson whether neurological surgeons and orthopedic surgeons coalesce on the spine. That's the testimony here. Use your common sense.

After closing, the Griffins moved to have the instructions amended to say "spinal surgeons" instead of "orthopaedic surgeons." The district court denied that motion, stating that the "jury understands the Court's instructions, and the jury understands that the Court recognized Dr. Lieberson as an expert and was able to give his opinion in this case."

The jury returned a verdict in favor of Foley. The Griffins moved for judgment as a matter of law or, in the alternative, for a new trial. The district court denied that motion. Nineteen days after trial, the Griffins served a subpoena on Sasso, Foley's expert who testified at trial. The subpoena required that Sasso

1. Produce redacted copies of any and all operative report(s) for repairing/fusing with internal fixation of a thoraco-lumbar burst vertebral fracture using coral reef a/k/a ProOsteon 500 without autologous iliac crest bone graft in 1994 and/or 2006.

2. Produce redacted copies of any operative report at any time since the year 1994 wherein a laminectomy was performed during the course of repairing/fusing with internal fixation of a thoraco-lumbar burst vertebral fracture.

3. Produce redacted copies of any operative report for repairing/fusing with internal fixation of a thoraco-lumbar burst fracture in the year 1994 to present wherein the operative note denotes the use of bone recovered from a laminectomy as bone graft.

4. Produce any peer reviewed journal article or textbook that articulates/discusses/recommends the use of ProOsteon/coral reef in spinal fusions in the years 1994, 1995, 1996, or 1997.

5. Produce any peer reviewed journal article or textbook that articulates/discusses/recommends the use of ProOsteon/coral reef without iliac crest autologous bone graft in thoraco-lumbar spinal fusions.

6. Produce any peer reviewed journal article or spinal text that states that iliac crest autograft is not osteoinductive and contains no live cells when used as a graft.

Foley filed a motion for a protective order seeking to quash the subpoena and stop any post-trial discovery. The Griffins responded that the discovery was necessary because, among other reasons, they "believe[d]" that Sasso testified falsely at trial when he stated that "there are many scientific articles and clinical studies that have been done looking at hydroxyapatite Pro Osteon to extend bone grafting in this instance." The Griffins submitted two affidavits with their response, one from Dr. Lieberson claiming that "Sasso's testimony was likely misleading and possibly inaccurate"; and the other from Dr. Weis stating that "either Dr. Sasso's testimony or my testimony was inaccurate."

The district court granted the motion for the protective order. This appeal followed.

II.

On appeal, the Griffins raise several challenges to the district court's management of their case both before, during, and after trial. First, the Griffins argue that the district court erred in granting Foley an extension of time to respond to their August 9, 2006, motion to bar expert testimony about the use of coral reef meeting the standard of care. They assert that Foley's stated reason for the extension—that he needed to wait until the medical review

panelists submitted their Rule 26 expert reports before responding—was a mere pretext because Foley never produced expert reports for the panelists. The Griffins further contend that since Foley had Sasso's Rule 26 report completed as of June 15, 2006, Foley should have been able to respond to the Griffins' motion well before the August 24 deadline.

We review a district court's decision to grant an extension of time for an abuse of discretion. *Research Sys. Corp. v. IPSOS Publicite*, 276 F.3d 914, 919 (7th Cir. 2002) (noting that "[t]he decision concerning whether to grant a continuance is left to the broad discretion of the district court"). "District court judges, because of the very nature of the duties and responsibilities accompanying their position, possess great authority to manage their caseload." *Gonzales v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1030 (7th Cir. 1998) (quoting *United States v. Reed*, 2 F.3d 1441 (7th Cir. 1993)). For that reason, "[m]atters of trial management are for the district judge; we intervene only when it is apparent that the judge has acted unreasonably." *Research Sys.*, 276 F.3d at 919 (quoting *N. Ind. Pub. Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265, 269 (7th Cir. 1986)).

Although Foley later decided not to file expert reports from the medical review panelists, we assess the reasonableness of the district court's decision to grant the extension at the time it was made—not in hindsight. *See Johnson v. Doughty*, 433 F.3d 1001, 1006 (7th Cir. 2006). And viewing this issue from that vantage point, we find no abuse of discretion in the district court's decision to grant Foley an extension. Extensions of time to respond

to important motions, like this one (which effectively sought to prevent Foley from presenting a defense on the central issue in the case), are routinely granted by district courts and rarely questioned on appeal. With the expert reports from the medical review panelists still outstanding, it would have made little sense to require Foley to respond to the Griffins' motion twice, first with respect to Sasso and later when those expert reports were completed. Such a piecemeal approach would have been a waste of the parties' and the court's time. Moreover, though the Griffins incurred some inconvenience from the granting of the extension, the extension was not prejudicial. The trial did not commence until April 2007, more than half a year after Foley's response was filed. Thus, the Griffins had ample time to effectively prepare for trial even with the delay caused by the granting of an extension of time for Foley to respond.

Next, the Griffins take issue with the district court's admission of testimony from defense witnesses concerning the support in the medical literature for the use of Pro Osteon in a spinal fusion surgery. We review the district court's decision to admit or exclude evidence for an abuse of discretion. *Estate of Moreland v. Dieter*, 395 F.3d 747, 753 (7th Cir. 2005). "Under the 'abuse of discretion' standard of review, the relevant inquiry is not how the reviewing judges would have ruled if they had been considering the case in the first place . . . ." *Wheeler v. Sims*, 951 F.2d 796, 802 (7th Cir. 1992) (quoting *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 563 (7th Cir. 1984)). Rather, the district court's decision is to be overturned only if no reasonable person would agree with the trial

court's ruling. *Snipes v. Ill. Dep't of Corr.*, 291 F.3d 460, 463 (7th Cir. 2002).

The Griffins object to Dr. Sasso's testimony at trial that there were "many scientific articles and clinical studies that have been done looking at hydroxyapatite Pro Osteon to extend bone grafting in this instance." According to the Griffins, the admission of that testimony was unfair because they specifically requested the production of any peer-reviewed scientific articles upon which Sasso planned to rely in his trial testimony, yet never received any.

The Griffins admit that they did not object to that testimony at trial. Yet they attempt to avoid forfeiture by pointing to the district court's denial of one of their motions in limine and claiming that it preserved their objection pursuant to Fed. R. Evid. 103(a).[11] The motion to which they refer stated:

> Defendant has listed on his Amended Final Witness and Exhibit List "medical literature relied upon by medical experts and/or physicians." Defendant has not disclosed any medical literature or treatises which his medical experts relied upon in formulating their opinions in this case. . . . *Should Defendant use any undisclosed literature, articles or treatises in his direct (or re-direct) examination of his experts*, the same will . . .

---

[11] That rule states that "[o]nce the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal."

> effectively deny Plaintiffs a reasonable opportunity for their counsel to review the materials to confirm that the "whole article" stands for the proposition being made with the witness on the stand; or whether statements contained therein are being taken out of context so as to mislead the jury. (Had the disclosure been timely, preparation for such instances could have been made.) Accordingly, *Plaintiffs move to preclude Defendant from using any literature or treatises in the direct or re-direct examinations of his experts*.

(Emphasis added.) Notably, the motion attempted only to prevent Foley from introducing any specific medical article or treatise that was not disclosed before trial in his case in chief. It did not cover Sasso's testimony, however, which concerned only Sasso's general recollection of the support in the medical literature for using Pro Osteon as a bone graft extender and did not discuss any specific articles.[12] That testimony was fully disclosed before trial.[13]

---

[12] Indeed, Sasso admitted during cross-examination that he did not bring (nor was asked to bring by Foley's counsel) any specific article that supported the use of Pro Osteon.

[13] The Griffins should have been well aware before trial that Dr. Sasso was going to testify that his opinion about Pro Osteon was based on his general recollection of the medical literature, and not on any specific article. Dr. Sasso's Rule 26 report stated that he based his opinions on his "training, experience, and research interests" and that the use of Pro Osteon as a bone-graft extender was a "well-recognized" technique. Dr. Sasso further elaborated in an affidavit supplementing that report: "As for the
(continued...)

Consequently, the Griffins have failed to preserve their objection to Sasso's testimony for appellate review. Fed. R. Evid. 103(a)(1); *see also Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 727 (7th Cir. 1999) ("When a party fails to timely and properly object at trial to the admission of evidence, the party is deemed to have waived the issue on appeal.").

Furthermore, even if the Griffins' motion in limine had preserved their objection, we see no error warranting reversal in allowing Sasso to testify thus. Sasso did not refer to any specific medical literature supporting the use of Pro Osteon in this case. He made one brief reference to his general understanding of the medical literature in the passage of his testimony quoted above. Moreover, Foley's attorney did not attempt to elicit any more testimony on that subject. And the Griffins' attorney had more than ample opportunity during cross-examination to challenge the basis for Sasso's statement, just as Foley's attorney had the same opportunity after Weis gave what was essentially an opinion contrary to Sasso's.[14] The Griffins' substantial rights were therefore not affected by

---

[13] (...continued)

methodology utilized in developing my opinions, my opinions are based upon my education, training, experience, research, clinical practice, scientific presentations and *understanding of the literature in the area of orthopaedic surgery*." (Emphasis added.)

[14] Weis testified during direct examination to the effect that it was not an established practice in the medical community to use Pro Osteon in the manner Foley did. On cross-examination, Foley's attorney asked whether Weis had "done any specific literature review or looked at any specific articles to develop [his] opinions," to which Weis responded: "I have not."

the admission of Sasso's testimony. *See* Fed. R. Civ. P. 61; *see also Wipf v. Kowalski*, 519 F.3d 380, 386 (7th Cir. 2008).

The Griffins also object to the district court's admission of Foley's testimony on redirect about two articles, one from the manufacturer of Pro Osteon and one from an advertising trade publication, "Orthopedics Today," discussing the use of Pro Osteon in spinal fusions. They provide little argument in their brief, however, explaining why that testimony was objectionable, other than to repeat the hearsay and relevancy objections their lawyer made at trial. In any event, the district court did not abuse its discretion in admitting that testimony because the Griffins' attorney "opened the door" to it. "[W]hen a party opens the door to evidence that would be otherwise inadmissible, that party cannot complain on appeal about the admission of that evidence." *United States v. Gilbertson*, 435 F.3d 790, 797 (7th Cir. 2006) (internal citation omitted). As the district court noted here, counsel for the Griffins during cross-examination questioned Foley specifically about the two articles. On redirect, Foley testified that those two articles, which he had produced for the Griffins' attorney, did support the use of Pro Osteon in spine fusions.[15] Since that testimony was elicited simply to rebut the impression that Foley had not provided any information on the use of Pro Osteon in spinal fusions, its admission was proper. *Cf. Wipf*, 519 F.3d at 386 (finding that plaintiff "opened the door" to cross-examination on

---

[15] The articles themselves were not entered into evidence and admitted as exhibits to the jury.

a scientific article published in 2005 when her attorney questioned an expert about a previous article by the same author whose views were updated in the 2005 article).

The Griffins next challenge the district court's denial of their motion to strike the motions in limine Foley filed on September 27, 2006, which sought to limit the Griffins' expert testimony. According to the Griffins, the deadline for motions seeking to limit expert testimony at trial in the case management plan was August 10, 2006. Allowing Foley to file his motions more than a month and a half after that date, the Griffins argue, was an abuse of discretion, deprived them of a fair trial, and amounted to "trial by ambush." The problem with that argument is that even if the district court's action in allowing Foley's motions to be filed at so late a date constituted a gross abuse of discretion, the Griffins cannot show that they were deprived of a fair trial—nor that they were subjected to "trial by ambush"—by that error. The Griffins' motion to strike Foley's motions in limine was denied on October 4, 2006. *The very next day*, the Griffins filed a motion—which was granted—to reset the trial date. The trial did not commence until April 6, 2007, more than *six months* after the denial of the Griffins' motion to strike (and the district court's decisions on Foley's motions in limine). In light of that chronology, the Griffins' claim that they were somehow "ambushed" at trial due to the late filing of Foley's motions in limine has no merit.

Next, the Griffins argue that the district court erred in refusing to allow them to use the "discovery" portions of

the first depositions of their experts at trial. They also challenge the exclusion of the testimony their lawyer elicited from Weis during the beginning of the follow-up deposition. As was mentioned above, we review a district court's decision to admit or exclude evidence for an abuse of discretion. *Dieter*, 395 F.3d at 753.

The Griffins argue that the district court's distinction between "evidentiary" and "discovery" depositions is erroneous. They cite to *Tatman v. Collins*, 938 F.2d 509 (4th Cir. 1991). In that case, the plaintiff's expert became unavailable due to a scheduling conflict. As a consequence, the plaintiff sought to introduce the expert's deposition testimony at trial. The defendant objected, and the district court excluded the deposition on the basis that it was a "discovery" deposition rather than one taken for use at trial. The Fourth Circuit reversed, stating that "[t]he Federal Rules of Civil Procedure make no distinction for use of a deposition at trial between one taken for discovery purposes and one taken for use at trial." *Id*. at 510.

We acknowledge the *Tatman* court's general point that the rules are silent regarding any distinction between depositions for discovery purposes and those taken for the purpose of use at trial. But given the particular circumstances that arose during discovery in this case, *Tatman* does not resolve the issue. In contrast to the situation in *Tatman*, the Griffins were well aware of the unavailability of their experts long before trial. Shortly before Foley's first discovery deposition of the Griffins' experts was scheduled to begin, the Griffins sought to

include their own deposition of their expert at the same sitting for use as their evidentiary proof at trial. Foley's attorneys objected, asserting that they had not been given a sufficient opportunity to discover the basis of the expert testimony by the Griffins' experts in order to prepare for cross-examination. The magistrate judge, responding to that concern,[16] ordered that Foley first be allowed to take depositions of the Griffins' experts for discovery purposes, followed at a later date by a deposition to be used for purposes of trial. In essence, the magistrate judge proposed a separate deposition schedule for each expert purely for the purposes of obtaining testimony for use at trial. (Though the magistrate judge's order contemplated that the second deposition would be for purposes of evidentiary proof, the Griffins' attorney chose to elicit testimony for use at trial immediately after Foley's counsel concluded the "discovery" portion of the experts' first depositions, instead of at the follow-up depositions.)

Although the rules are silent about employing such a procedure, we believe that the magistrate judge's use of it in this case was reasonable and within his discretion. Foley legitimately noticed the discovery depositions to be taken in advance of the evidentiary depositions. The obvious purpose of discovery is to determine the

---

[16] Although the Griffins claim that the experts' Rule 26 reports should have been enough for Foley to prepare his cross-examination of those experts, we note that in the district court the adequacy of the Griffins' Rule 26 disclosures was vigorously disputed.

opinions and positions of the opposition's witnesses and prepare for cross-examination. Had there not been some gap in time between the discovery depositions and the cross-examination of the Griffins' experts, Foley's attorneys would not have been able to effectively prepare for cross-examination.

Given the reasonableness of the magistrate judge's procedure for allowing the Griffins to obtain their evidentiary proof from their experts before trial, the district court did not abuse its discretion when, following through on what the magistrate judge had allowed, it confined the Griffins at trial to the "evidentiary" portions of the first depositions. The Griffins had already requested and been granted a fair opportunity to elicit deposition testimony for use at trial. The Griffins had their chance to ask Weis any question they wanted during the "evidentiary" portion of the first depositions. Foley's counsel's video-taped cross-examinations of the Griffins' experts were in response to the testimony presented in those designated evidentiary depositions. To allow the Griffins to introduce testimony from the experts' depositions that was outside the scope of the "evidentiary" portions would therefore have been unfair to Foley. For the same reason, the district court did not abuse its discretion in excluding the testimony elicited by the Griffins' attorney at the beginning of what was supposed to be confined to Foley's cross-examination of Weis.

The Griffins next challenge the inclusion of the phrase "orthopaedic surgeon" in Instructions 20, 21, and 22. Of those three, the Griffins primarily focus their arguments

on Instruction 22, which instructed the jury that "[i]n deciding whether an orthopaedic surgeon exercised reasonable care and skill in the treatment of a patient, you must consider only the expert testimony of qualified orthopaedic surgeons who are members of the orthopaedic surgeon's profession." The Griffins contend that Instruction 22's use of the confining phrase "orthopaedic surgeon" effectively wiped out the testimony of their expert Lieberson because he was a neurosurgeon and not an orthopedic surgeon. As a consequence, the Griffins seek a new trial.

In response, Foley asserts that the Griffins failed to timely object under Fed. R. Civ. P. 51. Subsection (b)(2) of Rule 51 states that the court must give the parties an opportunity to object on the record before the instructions and arguments are delivered. Subsection (c)(2) of Rule 51 states that "[a]n objection is timely if a party objects at the opportunity provided under Rule 51(b)(2)." Here, the district court gave the Griffins an opportunity to record objections to any of the instructions on the record. They objected to one instruction but failed to raise any objection to Instruction 22. While the Griffins argue that the mere tendering of proposed instructions different from the instructions given is sufficient to preserve the objection, we specifically rejected that argument in *Gordon v. Degelmann*, 29 F.3d 295, 298 (7th Cir. 1994).[17]

---

[17] The Griffins claim that *Gordon* is questionable authority in light of the 2003 amendments to Rule 51, but that is not correct.

(continued...)

Thus, their objection was not properly preserved.

Nevertheless, as a last resort, Rule 51 now allows a court to remedy an error in the instructions that was not properly preserved if the error is plain and affects substantial rights. Fed. R. Civ. P. 51(d)(2); *see also Mesman v. Crane Pro Servs.*, 512 F.3d 352, 357 (7th Cir. 2008) ("[W]hile a plain error even in instructions in a civil case is now a basis for reversal, reversal is not automatic; it is in the discretion of the reviewing court . . . ." (Internal citations omitted.)). Assuming that it was error to use "orthopaedic surgeon" in Instruction 22 when an important witness was a neurosurgeon, that error does not merit a new trial. Although the issue is close, the Griffins have not shown that the error in instruction affected their substantial rights. In other words, the Griffins' case "is not so strong that we can say that had it not been for an erroneous instruction [they] would surely have prevailed at trial." *Mesman*, 512 F.3d at 357.

Instruction 22 operated to remove from the jury's consideration Lieberson's testimony with respect to the

---

[17] (...continued)

Though adding plain error review, the 2003 amendments to Rule 51 actually *tightened* the window during which an objection to a jury instruction is proper. The pre-2003 rule allowed a timely objection at any time "before the jury retires to consider its verdict," *Gordon*, 29 F.3d at 298 (quoting Rule 51 as it was before the 2003 amendments), whereas the rule now requires a party to object at the opportunity provided by the court "before the instructions and arguments are delivered." Fed. R. Civ. P. 51(b)(2) (2008).

standard of care. If Lieberson had been the only expert testifying in favor of the Griffins on the issues surrounding the standard of care, then we might be compelled to reverse.[18] But the Griffins' was not a one-expert case. Instruction 22 did not leave the Griffins bereft of all expert testimony on the standard of care because the jury still had Weis's testimony before it. Weis gave substantially the same opinions as Lieberson on the crucial standard-of-care issues, such as whether Foley ought to have used bone from Lisa's iliac crest rather than laminar bone for a bone graft, whether Foley's use of Pro Osteon in Lisa's surgery violated the standard of care, and whether Foley met the standard of care in his postoperative treatment of Lisa.[19] True, the testimony of Lieberson and that of Weis were not identical; in fact, in

---

[18] The Griffins were able to argue that the district court qualified Lieberson as an expert, so the jury would still have considered his testimony to a certain extent—just not with respect to whether Foley exercised reasonable care and skill in the treatment of Lisa.

[19] There is one opinion on the standard of care that Lieberson expressed that was not reiterated by Weis. Lieberson stated that the laminectomy Foley performed during the surgery was not necessary. If Instruction 22 erroneously excluded Lieberson's testimony, then it would have prevented the jury from considering that opinion. The exclusion of that opinion from the jury's consideration does not warrant reversal, however, because Foley himself testified during cross-examination that the laminectomy was not necessary for purposes of decompressing the spinal canal. Given Foley's admission, Lieberson's opinion testimony with respect to the need for a laminectomy was not essential to the Griffins' case.

many instances Lieberson's opinions were much more detailed and clearly explained. Lieberson also testified live, while Weis's testimony was via videotaped deposition. Nevertheless, viewing the evidence presented at trial as a whole, we are unable to conclude that Lieberson's testimony, giving substantially the same opinions on the standard of care as Weis, would have swayed the jury verdict in the Griffins' favor had not Instruction 22 excluded it. Thus, we decline to exercise our discretion to order a new trial on account of Instruction 22.

Lastly, the Griffins claim that, after trial, the district court erred in quashing their subpoena seeking post-trial discovery from Sasso. The Griffins believe that Sasso lied when he stated at trial that "there are many scientific articles and clinical studies that have been done looking at hydroxyapatite Pro Osteon to extend bone grafting." They assert that the information subpoenaed was necessary to establish Sasso's dishonesty.

We review a district court's decision to limit discovery for abuse of discretion. *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 629 (7th Cir. 2004). There was no abuse of discretion here. The district court had closed discovery long before the Griffins' post-trial attempt to subpoena Sasso. The place to challenge Sasso's statement was during cross-examination, not after trial. Post-trial discovery is usually reserved for when a party becomes aware of new information after trial. *See Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1324 (Fed. Cir. 2001). Although at least one court has allowed post-trial discovery where there was evidence of perjury, *see Viskase Corp. v. Am. Nat'l Can Co.*,

979 F. Supp. 697, 699-703 (N.D. Ill. 1997), the Griffins have not offered any evidence of perjury that would justify post-trial discovery in this instance. The affidavits of Weis and Lieberson accompanying the Grifffins' response to Foley's motion for a protective order say only that they believed Sasso's testimony to be "inaccurate"; they do not begin to show that Sasso's testimony was false, much less perjury.[20] *See Montaño v. City of Chicago*, __ F.3d __ , No. 06-2148, slip op. at 8 (7th Cir. July 23, 2008) (defining perjury as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory"). Thus, the district court did not abuse its discretion by refusing to allow discovery in response to the Griffins' unsubstantiated allegations of false testimony. *See H.K. Porter Co. v. Good-year Tire & Rubber Co.*, 536 F.2d 1115, 1122 (6th Cir. 1976) ("The District Judge who presided over this protracted trial and who considered the evidence offered by Goodyear in support of its Rule 60(b) motion, did not believe that any fraud on the Court had been perpetrated on him. As an experienced trial judge he was in the best position to

---

[20] Indeed, Weis's statement in his affidavit that during the "considerable amount of time searching the medical literature" he spent in preparation for the case he was "unable to establish any basis upon which Dr. Sasso could reassure the court regarding the appropriate use of coral hydroxapatite" was itself misleading, since Weis acknowledged during cross-examination that he had not done any specific review of the medical literature with respect to his opinion about the appropriate use of Pro Osteon.

know. He was also in a good position to evaluate whether [the proposed discovery] would have made any difference in his holding . . . .").

Moreover, the district court was well within its discretion to quash the subpoena as unduly burdensome. *See* Fed. R. Civ. P. 45(c)(3)(A)(iv). What the subpoena sought from Sasso was far more expansive than information related to his testimony about articles and studies supporting the use of Pro Osteon. For instance, the subpoena commanded Sasso to produce "redacted copies of any operative report at any time since the year 1994 wherein a laminectomy was performed during the course of repairing/fusing with internal fixation of a thoraco-lumbar burst vertebral fracture." It also would have required Sasso to "[p]roduce redacted copies of any operative report for repairing/fusing with internal fixation of a thoraco-lumbar burst fracture in the year 1994 to present wherein the operative note denotes the use of bone recovered from a laminectomy as bone graft." Those far-reaching requests had nothing to do with whether any articles or studies supporting the use of Pro Osteon existed. The Griffins' contention that the district court abused its discretion in quashing their untimely and overly-broad subpoena is without merit.

III.

As we have said before, "civil litigants are entitled to a fair trial, not a perfect one." *Lemons v. Skidmore*, 985 F.2d 354, 357 (7th Cir. 1993). In its order denying the Griffins' motion for a new trial, the district court stated that it was

satisfied that the Griffins received a fair trial. We echo that sentiment, and AFFIRM the judgment of the district court.